**MISSISSIPPI COMMISSION ON NATURAL RESOURCES, Plaintiff-Appellant,**

v.

**Douglas M. COSTLE, Administrator, U.S. Environmental Protection Agency, and U.S. Environmental Protection Agency, Defendants-Appellees.**

No. 79–3538.

United States Court of Appeals, Fifth Circuit.

Sept. 18, 1980.

William A. Allain, Atty. Gen., Jackson, Miss., LeBoeuf, Lamb, Leiby, MacRae, G. S. Peter Bergen, New York City, J. I. Palmer, Jr., Jackson, Miss., for plaintiff-appellant.

James N. Christman, J. Kennerly Davis, Jr., Turner T. Smith, Jr., Richmond, Va., amicus curiae.

Robert E. Hauberg, U.S. Atty., L. K. Travis, Asst. U.S. Atty., Jackson, Miss., for defendants-appellees.

William L. Andreen, Atlanta, Ga., James W. Moorman, Asst. Atty. Gen., Robert L. Klarquist, Land & Natural Resources Div., U.S. Dept. of Justice, Martin W. Matzen, Washington, D. C., for EPA.

Before GEE, FAY and RANDALL, Circuit Judges.

FAY, Circuit Judge:

The Mississippi Commission on Natural Resources (Commission)[1] challenges the authority of the United States Environmental Protection Agency (EPA) to promulgate a water quality standard on dissolved oxygen for Mississippi. The Commission filed a complaint seeking a declaratory judgment that EPA's rejection of the state standard and promulgation of a federal standard were arbitrary, capricious, and beyond EPA's authority. The Commission sought a preliminary and permanent injunction against enforcement of EPA's standard. The district court granted the preliminary injunction. After cross-motions for summary judgment, the court granted judgment to EPA and dissolved the preliminary injunction. The Commission appeals pursuant to 28 U.S.C. § 1291 (1976). We affirm the district court.

I. *Statutory Framework*

Prior to 1972, the Federal Water Pollution Control Act (FWPCA) relied primarily upon state-promulgated water quality standards as the means for reaching its goal of enhancing the quality of the nation's waters. A water quality standard has two components. The first is the use for the water in an area. Possible uses are for industry, agriculture, propagation and protection of fish and wildlife, recreation, and public water supply. The second component is the water quality criteria necessary to meet the designated use. For most pollutants, criteria are expressed as specific numerical concentration limits. For example, a state might set the water quality

---

1. Although we will refer to the "Commission" throughout this opinion, most of the acts detailed here were done by a predecessor of the current Commission, the Mississippi Air and Water Pollution Control Commission. That commission ceased to exist June 30, 1979 because of an agency reorganization.

standard for a certain creek by designating it as a fishing area and requiring that the chloride concentration be no greater than 250 milligrams per liter of water.

In 1965, Congress considered whether the states or a federal administrator should establish water quality standards. Concerned that federal promulgation would discourage state plans for water quality and "would place in the hands of a single Federal official the power to establish zoning measures over—to control the use of—land within watershed areas" throughout the nation, Congress gave the states primary authority to set water quality standards. H. Rep. 215, 89th Cong., 1st Sess., *reprinted in* [1965] U.S. Code Cong. & Admin. News pp. 3313, 3320–23. The state standards and plans were submitted to the federal administrator, who determined whether they were consistent with the Act's requirements. If the state did not adopt complying standards, the administrator promulgated water quality uses and criteria.

■ The Act "focused on the tolerable effects rather than the preventable causes of water pollution." *EPA v. California Water Resources Control Board*, 426 U.S. 200, 202, 96 S.Ct. 2022, 2023, 48 L.Ed.2d 578 (1976). Problems with translating violations of standards into limits on particular polluters, the lack of enforcement, and the "awkwardly shared federal and state responsibility" led to amendments in 1972. *Id.* at 202, 96 S.Ct. at 2023; S. Rep. 92–414, 92d Cong., 2d Sess., reprinted in [1972] U.S. Code Cong. & Admin. News pp. 3668, 3669–77. The major change was the establishment of the National Pollutant Discharge Elimination System (NPDES), under which it is illegal to discharge pollutants without a permit complying with the Act. The amendments focus on limiting the sources of pollution through EPA issued permits. A state can issue NPDES permits upon EPA approval of its program. The permits are the primary means for reaching the national goal of eliminating discharge of pollutants into water by 1985 and the interim goal of reaching a level of water quality, wherever attainable, "which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . by July 1, 1983." 33 U.S.C. § 1251(a)(1)–(2) (1976).

In the Senate version of the amendments, section 302 utilized water quality standards as a way to measure the permit program's effectiveness. If the effluent limitations were not stringent enough to meet the interim water quality goal, a more restrictive standard could be set after public hearing. The House added section 303 to the Act to continue the use of state water quality standards. The Conference Committee adopted section 302 of the Senate bill after deleting all reference to state authority. The Committee also added a modified version of the House amendment. As the Act was passed, states promulgate water quality standards, which are submitted to EPA for approval. EPA can promulgate standards if the state does not set standards consistent with the Act or whenever EPA determines that another "standard is necessary to meet the requirements of [the Act]." State standards are reviewed every three years. 33 U.S.C. § 1313 (1976). NPDES permits must contain not only any effluent limitations set by EPA and the states, but also any more stringent limits necessary to reach the water quality standards. *Id.* § 1311(b). If EPA determines that limits on discharges from a source or group of sources are insufficient for the water quality set for that area, it can, after hearing, set effluent limitations designed to reach that standard. *Id.* § 1312. In addition, EPA must develop and publish "criteria for water quality accurately reflecting the latest scientific knowledge." *Id.* § 1314.

## II. *Facts*

The dispute in this case arises from EPA's refusal to approve the Mississippi water quality standard for dissolved oxygen (DO) and EPA's subsequent promulgation of a DO standard. Dissolved oxygen is necessary for the protection and propagation of fish and aquatic life, and is generally measured in milligrams per liter (mg/l).

In 1946, the Mississippi Game and Fish Commission adopted a regulation requiring a minimum average DO concentration of 3.0 mg/l and an instantaneous minimum of 2.5 mg/l. Under this standard, the DO concentration could drop as low as 2.5 so long as compensating periods at higher concentrations raised the daily average to 3.0 mg/l.

In response to state and federal legislation, the Commission adopted standards on January 17, 1967 requiring a minimum daily average DO of 4.0 mg/l. The 1972 amendments to the Act allowed preexisting water quality standards to remain in effect upon approval by EPA. 33 U.S.C. § 1313(a)(1)–(2) (1976). These standards were approved in October, 1972.

On January 18, 1973, EPA advised the Commission that it was time for the triennial review of its standards. After public hearings, the Commission submitted to EPA a DO standard of not less than an average of 5.0 mg/l, but allowing a level of 4.0 mg/l during periods with extremely low water levels.[2] The low flow standard applies to days with the lowest water level that occurs for seven consecutive days in ten years (7 days Q 10). On May 15, 1973, EPA approved the Commission's water quality standards, stating they were in "full compliance with the 1972 Amendments to the Federal Water Pollution Control Act."

As noted above, one of EPA's duties under the amendments is to develop and publish "criteria for water quality accurately reflecting the latest scientific knowledge." 33 U.S.C. § 1314(a)(1) (1976). These criteria were to be published one year after October 18, 1972 and from time to time thereafter. *Id.* EPA gave notice of the availability of *Quality Criteria for Water*, also called the Red Book, on October 26, 1973. It thereafter became EPA's policy to request a state to justify its standards whenever the state submitted for approval water quality criteria less stringent than those in the Red Book.

In 1976, at the time for Mississippi's triennial review, EPA conferred with the Commission about upgrading its DO standard. Although the likelihood of the 7 day Q 10 rate's occurring for seven *straight* days is only once in ten years, that particular low flow rate actually occurs for significant periods virtually every year. In addition, the 4.0 mg/l 7 day Q 10 standard is an average, which therefore allows the DO level to fall below 4.0 on numerous occasions each year. Higher DO concentrations reduce crowding of fish and the resulting susceptibility to disease and toxicants. Adult fish generally are more tolerant of lower DO levels than juvenile forms. Lower levels also interfere with fish spawning.

The Commission forwarded to EPA for comment a proposed standard which required 5.0 mg/l with an instantaneous minimum of 4.0 mg/l, but allowed the DO to range between 5.0 and 4.0 for short periods. The Commission also proposed a higher standard of 5.0 mg/l for shellfish harvesting areas. In March, 1977, the Commission held hearings on the proposal. EPA advised that the proposal appeared to meet the Act's requirements. The Commission, however, abandoned the proposal and on April 22, 1977, submitted to EPA its existing 5.0 mg/l—4.0 mg/l 7 days Q 10 standard.

On June 9, 1977, EPA notified the Commission that it questioned the adequacy of the DO criteria. Specifically, Mississippi's DO standard was the only one in its region below 5.0 for 7 day Q 10 conditions, and it

---

**2.** The Mississippi standard reads as follows: Dissolved Oxygen: For diversified warmwater biota, including game fish, daily dissolved oxygen concentration shall be maintained at a minimum of not less than 4.0 mg/l during the low 7-day, one-in-ten-years flow. However, at all greater flows dissolved oxygen shall be maintained at not less than 5.0 mg/l, assuming there are normal seasonal and daily variations above this level; except that under extreme conditions, with the same stipulations as to seasonal and daily variations, the dissolved oxygen level may range between 5.0 mg/l and 4.0 mg/l for short periods of time, provided that the water quality is maintained in favorable conditions in all other respects.

That the 4.0 concentration is an average is clear from documents supplied to EPA by the Commission. Record, Appendix C, at 208.

was below the 5.0 mg/l criteria established in the Red Book. In accordance with its policy, EPA requested justification for the lower standard. The Commission sent its report on July 21. Pending review of the report, EPA disapproved the DO criteria. On August 24, 1977, EPA notified the Commission that it found Mississippi's justification unpersuasive. EPA gave the Commission until October 24, 1977 to promulgate an appropriate standard. EPA recommended a daily average of 5.0 mg/l and a minimum of 4.0 mg/l.

The Commission reconsidered its standard in September, 1977, and decided the state's standard was in the public interest.

EPA found this action insufficient and on July 13, 1978, proposed a DO standard of 5.0 mg/l at all times. In September, 1978, two public hearings were held in Mississippi as part of the rulemaking process. In response to public comment, EPA revised its proposed rule and adopted the less stringent standard of 5.0 mg/l daily average with an instantaneous minimum of not less than 4.0 mg/l. This standard, which was promulgated April 24, 1979, was very similar to the one initially proposed and then abandoned by the Commission when the 1976 triennial review began.

The Commission then filed this action for an injunction and declaratory judgment.

### III. The Commission's Position

The Commission argues that EPA exceeded its powers both in its disapproval of the state DO criteria and in its promulgation of a federal standard. As to the disapproval, the Commission emphasizes that Congress intended for the states to have primary responsibility in setting water quality standards. The Commission reasons that EPA therefore cannot substitute its judgment for the state's unless the state standard is arbitrary, capricious, or totally unreasonable. According to the Commission, since the same standard was approved in 1973, it cannot be disapproved now. Furthermore, EPA can only disapprove standards that fail to meet the requirements of the Act. The Commission argues that EPA is enforcing its policies as though they were

the Act's requirements. In addition, the Commission claims that EPA improperly failed to consider economic factors in evaluating the DO criteria and that EPA ignored and misinterpreted evidence presented at hearings.

The Commission also attacks EPA's promulgation of its own standard. Because EPA did not promulgate the standard within ninety days, it therefore, according to the Commission, lost the power to act. The Commission also claims that nothing in the record supports a 4.0 mg/l instantaneous minimum. The standards in nearby states are irrelevant. The Commission asserts that Mississippi's flat topography and subtropical summer climate result in naturally low DO concentrations. According to the Commission, Congress intended for the individual states to account for these regional variations in setting criteria and did not intend for these differences to be ignored for the sake of bureaucratic uniformity.

### IV. The District Court's Order

The district court acknowledged that states are given the first opportunity to establish water quality standards, but held that states were not given unfettered discretion. Although the court agreed that EPA had missed its deadline for promulgating the standard, it disagreed on the result that produced. The court held that section 706 of the Administrative Procedures Act (APA) required consideration of whether the state had been prejudiced by delay, and held that no prejudice had been shown. The court addressed the state's substantive challenges to EPA's decisions and held that the agency's actions were justifiable and reasonable, not arbitrary or capricious.

### V. Scope of Review

■ The Commission does not question the application of APA section 706 to this case. That section provides in part:

The reviewing court shall—

.    .    .    .    .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   .     .     .     .     .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]

(D) without observance of procedure required by law . . . . .

In making the foregoing determinations, the court shall review the whole record or those parts cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (1976). Under section 706, generally a court must consider three questions: first, whether the administrator acted in the scope of his authority; second, whether the choice made was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; and third, whether the agency followed procedural requirements. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–17, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971); *Texas v. EPA*, 499 F.2d 289, 296 (5th Cir. 1974), *cert. denied*, 427 U.S. 905, 96 S.Ct. 3191, 49 L.Ed.2d 1199 (1976). Those questions are "divisible into three categories—statutory, procedural and substantive." *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1024 (D.C. Cir. 1978).

■ For EPA to promulgate a water quality standard, it must determine that the state's standard "is not consistent with the applicable requirements of [the Act]" or that "a revised or new standard is necessary to meet the requirements of [the Act]." 33 U.S.C. § 1313(c)(3), (c)(4)(B) (1976). Review is therefore centered around two issues: first, whether EPA's disapproval of Mississippi's DO standard was proper; and second, whether EPA properly promulgated the substitute standard. *See Texas v. EPA*, 499 F.2d at 294. The relevant statutory, substantive, and procedural aspects of each issue will be considered.

## VI. *Disapproval of Mississippi's Standard*

### A. *Scope of Authority*

The Commission contends that EPA exceeded its statutory authority by tipping the balance of federal and state power created by Congress in the FWPCA. The Commission argues that EPA may substitute its judgment only if a state fails to act or acts irresponsibly. Furthermore, the Commission asserts that EPA misconstrues its authority as allowing disapprovals of standards that do not meet the requirements of EPA policy instead of those not meeting the requirements of the Act.

■ Congress did place primary authority for establishing water quality standards with the states. Furthermore,

> [i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b) (1976). As noted above, the legislative history reflects congressional concern that the Act not place in the hands of a federal administrator absolute power over zoning watershed areas. The varied topographies and climates in the country call for varied water quality solutions.

■ Despite this primary allocation of power, the states are not given unreviewable discretion to set water quality standards. All water quality standards must be submitted to the federal Administrator. 33 U.S.C. § 1313(c)(2) (1976). The state must review its standards at least once every three years and make the results of the review available to the Administrator. *Id.* § 1313(c)(1). EPA is given the final voice on the standard's adequacy:

> If the Administrator determines that any such revised or new standard is not consistent with the applicable requirements of this chapter, he shall not later than the ninetieth day after the date of submission of such standard notify the State and specify the changes to meet such requirements. If such changes are not adopted

by the State within ninety days after the date of notification, the Administrator shall promulgate such standard pursuant to paragraph (4) of this subsection.

*Id.* § 1313(c)(3). In addition, EPA can override state water quality standards by changing the effluent limits in NPSES permits whenever a source interferes with water quality. *Id.* § 1312.

EPA's role also is more dominant when water quality criteria are in question. Although the designation of uses and the setting of criteria are interrelating chores, the specification of a waterway as one for fishing, swimming, or public water supply is closely tied to the zoning power Congress wanted left with the states. The criteria set for a specific use are more amenable to uniformity. Congress recognized this distinction by placing with EPA the duty to develop and publish water quality criteria reflecting the latest scientific knowledge shortly after the amendment's passage and periodically thereafter. *Id.* § 1314(a)(1). EPA correctly points out that by leaving intact the Mississippi use designations it has acted in the manner least intrusive of state prerogatives.

■ Nothing indicates a congressional intent to restrict EPA'S review of state standards to the issue of whether the state acted arbitrarily or capriciously. The FWPCA requires EPA to determine whether the standard is "consistent with" the Act's requirements. The Commission argues that the Administrator has improperly construed his power as authorizing disapproval of state standards that do not meet EPA policy as embodied in the Red Book.

■ The statute enumerates the following requirements for water quality standards:

Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking

into consideration their use and value for navigation.

33 U.S.C. § 1313(c)(2) (1976). One purpose of the Act is

the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983.

*Id.* § 1251(a)(2). The EPA administrator did not improperly construe his authority by interpreting the FWPCA as allowing him to translate these broad statutory guidelines and goals into specifics that could be used to evaluate a state's standard. One "requirement of the Act" is that EPA formulate these policies for water quality criteria. *Id.* § 1314(a)(1). It was not unreasonable for the EPA Administrator to interpret the Act as allowing him to require states to justify standards not in conformance with the criteria policy.

The Commission's reliance on *Ford Motor Co. v. EPA*, 567 F.2d 661 (6th Cir. 1977) and *Washington v. EPA*, 573 F.2d 583 (9th Cir. 1978) is misplaced. Those cases involved EPA's veto of state NPDES permits in the absence of published guideline regulations. Unlike the water quality criteria section in question here, the statute requires EPA's effluent limitations to be embodied in regulations. 33 U.S.C. § 1314(b) (1976). EPA veto of a permit is quite different from disapproval of the water quality standard in this case. EPA prepares and publishes the proposed revised water quality standard. *Id.* § 1313(c)(4). Following the informal rulemaking procedures of the APA, EPA allows input on the proposal through public hearings and comment before promulgating the standard. 5 U.S.C. § 553 (1976). The public is assured the opportunity to react to the EPA criteria policy before it is adopted as part of a water quality standard. With NPDES permits, this input is supposed to be received when the effluent limitations become regulations; a public hearing after a veto comes only if the state requests it. 33 U.S.C. § 1342(d)(4) (1976).

We conclude that EPA did not exceed its statutory authority in disapproving the state water quality standard.

### B. *Substantive and Procedural Aspects of the Disapproval*

We turn to a consideration of whether the disapproval was arbitrary or capricious.

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823–24 (citations omitted).

■ With a position that contains both procedural and substantive elements, the Commission argues that EPA's approval of the 5.0—4.0 7 day Q 10 standard in 1973 estops EPA's disapproval of it now and renders EPA's action unreasonable. This position overlooks the congressional goal of attaining fishable and swimmable waters by 1983. Triennial review of state standards is a means of evolving and upgrading water quality standards. In addition, the Act authorizes EPA to set standards whenever the Administrator determines that a *revised* standard is necessary to meet the FWPCA's requirements. 33 U.S.C. § 1313(c)(4)(B) (1976). If EPA were bound by its prior approvals, this power would be meaningless. We also note that the prior approval in this case was before the statutory deadline for developing criteria under § 1314 and before the Red Book was published.

The Commission asserts that EPA failed to consider all relevant factors by excluding economic considerations in setting the DO criteria. EPA determined that while economic factors are to be considered in designating uses, those factors are irrelevant to the scientific and technical factors to be considered in setting criteria to meet those

uses. 44 Fed.Reg. 25223, –24, –26 (April 30, 1979). When criteria cannot be attained because of economic factors, EPA states that the particular water can be designated for a less restrictive use, a process called "downgrading." *Id.* at 25224. The Commission argues that the statute's requirement that "use and value" be considered in setting standards makes economic factors relevant to both the designation of uses and the setting of criteria. 33 U.S.C. § 1313(c)(2) (1976). Furthermore, it claims that EPA's policies against downgrading make its suggested solution illusory.

■ We note at the outset that EPA states it did examine the economic impact of its criteria and "concluded that a significant impact [was] not likely to occur." 44 Fed.Reg. at 25225–26. Nevertheless, we are convinced that EPA's construction is correct. *See E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, at 134–35, 97 S.Ct. 965, at 978–79, 51 L.Ed.2d 204. Congress itself separated use and criteria and stated that "the water quality criteria for such waters [shall be] based on such uses." 33 U.S.C. § 1313(c)(2) (1976). The statute requires EPA to develop criteria "reflecting the latest *scientific* knowledge." Id. § 1314(a)(1) (emphasis added). The interpretation that criteria were based exclusively on scientific data predates the 1972 amendments. *Water Quality Criteria* vii (1968). Furthermore, when Congress wanted economics and cost to be considered, it explicitly required it. *See* 33 U.S.C. §§ 1311(b)(2)(A), 1312(b), 1314(b) (1976).

EPA policy does permit downgrading when "substantial and widespread adverse economic and social impact" would otherwise result. 40 C.F.R. § 130.17(c)(3) (1978) (now codified at *id.* § 35.1550(c)(3) (1979)). *See also* 43 Fed.Reg. 29588, 29590 (July 10, 1978). General downgrading is not possible in this case, however, because Mississippi has the same standard for all uses. Furthermore, the statute requires that waters be at least fishable and swimmable "wherever attainable." 33 U.S.C. § 1251(a)(2). Mississippi's lowest use is fishable water. EPA does allow downgrading for particular

stream segments, *see* 43 Fed.Reg. 43741 (Sept. 27, 1978), and suggested this course to the Commission in its disapproval letter. Record, Appendix C, at 222.

The Commission also argues that EPA's disapproval was a clear error of judgment. EPA has determined that most fishable waters require a DO concentration of 5.0 mg/l. *Quality Criteria for Water* 224 (1976). It determined that the fish species in Mississippi, as throughout the South, would be adversely affected by a 4.0 mg/l average during the stressful low flow periods. Record, Appendix C, at 221–23. EPA cited laboratory and field studies supporting its position. Its disapproval of the state standard was not arbitrary or capricious.

### VII. *Promulgation of the Substitute Standard*

#### A. *The New DO Criteria*

■ Because EPA's disapproval of the DO standard was proper, it was within the scope of the Administrator's authority to promulgate a substitute standard. The question is whether the EPA was arbitrary or capricious in promulgating the DO criteria.

Mississippi wants its waters to support a diversified fish population. *See* note 2 *supra*. By weight, about 85% of the Mississippi fish can be classified as course or rough fish, such as catfish, carp, drum, buffalo, and shad. Nevertheless, the waters also include higher oxygen demanding gamefish, such as bass, (large mouth, spotted, white, and striped), white perch, bream, crappie, flounder, redfish, speckled trout, white trout, sheephead, croaker, blue gills, and red ear sunfish. Data cited by EPA in both its disapproval and as support for its standard "point very strongly to 5 [mg/l] as the lower limit of dissolved oxygen, if the complex is to maintain a desirable fish faunae under natural river conditions." Record,

vol. V, at Exh. 73. Testimony and data of experts based on laboratory and field studies support EPA's position that a 5.0 mg/l concentration is needed to support a balanced and diverse fish population and that 4.0 mg/l is the lowest safe level. In addition, fish are subject to more stress as water temperatures rise, a condition usually occurring during low flow periods. Record, Appendix A, at 18–19.

The EPA's DO criteria was not a clear error in judgment. Furthermore, EPA did not arbitrarily promulgate its 5.0 mg/l criteria without considering the Mississippi situation. After reviewing the statements from the public hearings, EPA promulgated a lower standard that allows an instantaneous minimum of 4.0 mg/l. EPA did not act in an arbitrary or capricious manner.

#### B. *Procedural Defects*

■ The Commission asserts that EPA's failure to promulgate its substitute criteria within ninety days after publishing the proposal precludes it from acting. *See* 33 U.S.C. § 1313(c)(4) (1976). EPA did miss the deadline.[3] The question is what are the consequences of its tardiness.

The FWPCA does not impose any sanctions for missing the deadline. The APA requires a consideration of whether prejudice has resulted. 5 U.S.C. § 706; *see E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. at 131–32 n. 22, 97 S.Ct. at 976–77 (failure to meet statutory deadlines relating to NPDES permits.) As the district court found, no prejudice is shown on this record.

The Commission's arguments that the EPA failed to give proper notice of the 4.0 minimum and that the EPA order is unclear are without merit. EPA promulgated a less stringent standard than that originally proposed, one which was subject to public hearing and comment as part of the review process in 1977. Despite the Commission's

---

**3.** Other courts have noted that the FWPCA imposed unrealistic statutory requirements and timetables on the EPA, which is usually in good faith "attempting to discharge the ambitious and often ambiguous duties imposed upon it . . . ." *Republic Steel Corp. v. Train*, 557 F.2d 91, 94 (6th Cir. 1977). *See, e. g., E. I. du*

*Pont de Nemours & Co. v. Train*, 430 U.S. 112, 122, 97 S.Ct. 965, 972, 51 L.Ed.2d 204 (1977); *American Petroleum Institute v. EPA*, 540 F.2d 1023, 1027 (10th Cir. 1976). EPA's delay cannot be condoned, but in light of its duties it is understandable.

failure to raise the clarity issue in the district court, we hold that the order is not too unclear for judicial review.

### VIII. *Conclusion*

The district court order dissolving the injunction and granting summary judgment to the government is AFFIRMED.