**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UPPER MISSOURI WATERKEEPER, *Plaintiff-Appellee*, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN,[*] Administrator, United States Environmental Protection Agency, *Defendants*, <br><br> TREASURE STATE RESOURCES ASSOCIATION OF MONTANA; STATE OF MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY, *Intervenor-Defendants*, <br><br> and <br><br> NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES; THE MONTANA LEAGUE OF CITIES AND TOWNS, *Intervenor-Defendants-Appellants*. | No. 19-35898 <br><br> D.C. No. 4:16-cv-00052-BMM |

---

[*] Michael Regan has been automatically substituted for former Administrator Andrew Wheeler. Fed. R. App. P. 43(c)(2).

UPPER MISSOURI WATERKEEPER,
*Plaintiff-Appellee*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; MICHAEL REGAN,
Administrator, United States
Environmental Protection Agency,
*Defendants*,

NATIONAL ASSOCIATION OF CLEAN
WATER AGENCIES; THE MONTANA
LEAGUE OF CITIES AND TOWNS;
STATE OF MONTANA DEPARTMENT
OF ENVIRONMENTAL QUALITY,
*Intervenor-Defendants*,

and

TREASURE STATE RESOURCES
ASSOCIATION OF MONTANA,
*Intervenor-Defendant-Appellant.*

No. 19-35899

D.C. No.
4:16-cv-00052-
BMM

UPPER MISSOURI WATERKEEPER,
*Plaintiff-Appellee*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; MICHAEL REGAN,
Administrator, United States
Environmental Protection Agency,
*Defendants*,

NATIONAL ASSOCIATION OF CLEAN
WATER AGENCIES; THE MONTANA
LEAGUE OF CITIES AND TOWNS;
TREASURE STATE RESOURCES
ASSOCIATION OF MONTANA,
*Intervenor-Defendants*,

and

STATE OF MONTANA DEPARTMENT
OF ENVIRONMENTAL QUALITY,
*Intervenor-Defendant-Appellant.*

No. 20-35135

D.C. No.
4:16-cv-00052-
BMM

UPPER MISSOURI WATERKEEPER,
*Plaintiff-Appellee*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; MICHAEL REGAN,
Administrator, United States
Environmental Protection Agency,
*Defendants-Appellants*,

and

NATIONAL ASSOCIATION OF CLEAN
WATER AGENCIES; THE MONTANA
LEAGUE OF CITIES AND TOWNS;
TREASURE STATE RESOURCES
ASSOCIATION OF MONTANA; STATE
OF MONTANA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
*Intervenor-Defendants*.

No. 20-35136

D.C. No.
4:16-cv-00052-
BMM

UPPER MISSOURI WATERKEEPER,
*Plaintiff-Appellant*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; MICHAEL REGAN,
Administrator, United States
Environmental Protection Agency,
*Defendants-Appellees*,

NATIONAL ASSOCIATION OF CLEAN
WATER AGENCIES; THE MONTANA
LEAGUE OF CITIES AND TOWNS;
TREASURE STATE RESOURCES
ASSOCIATION OF MONTANA; STATE
OF MONTANA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
*Intervenor-Defendants-Appellees*.

No. 20-35137

D.C. No.
4:16-cv-00052-
BMM

OPINION

Appeals from the United States District Court
for the District of Montana
Brian M. Morris, Chief District Judge, Presiding

Argued and Submitted March 4, 2021
Portland, Oregon

Filed October 6, 2021

Before:  Danny J. Boggs,[**] Richard A. Paez, and
Paul J. Watford, Circuit Judges.

Opinion by Judge Watford

---

**SUMMARY**[***]

**Clean Water Act**

The panel reversed the portion of the district court's summary judgment order challenged in Nos. 19-35898, 19-35899, 20-35135, and 20-35136, and affirmed the portion of the summary judgment order challenged in No. 20-35137, in actions challenging the U.S. Environmental Protection Agency's approval of Montana's variance request from approved water quality standards that were adopted under the Clean Water Act.

The Clean Water Act requires States to adopt water quality standards regulating pollutants in their navigable waters.  The standards consist of two components: (1) the designated uses for the water body, such as supporting aquatic life or recreational use; and (2) the "water quality criteria" necessary to protect those uses.  33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.3(b), 131.11(a).  States submit proposed water quality standards to the EPA for review and approval.

---

[**] The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The EPA approved Montana's water quality standards in 2015. In 2017, Montana sought, and obtained, EPA's approval of a variance in the water quality standard, which covered 36 municipal wastewater treatment facilities for a term of up to 17 years. The variance allowed those facilities to discharge more nitrogen and phosphorus into wadeable streams than would be permitted under the base water standards approved in 2015. Plaintiff Upper Missouri Waterkeeper contended that the EPA approval of the variance violated the Administrative Procedure Act. The district court granted partial vacatur of the EPA's approval of the variance, and stayed its decision pending resolution of the appeals.

First, the panel considered Waterkeeper's cross-appeal, which contended that a provision of the Clean Water Act, 33 U.S.C. § 1313(c)(2)(A), precluded the EPA from taking compliance costs into account when approving the variance requests. Applying *Chevron* analysis, the panel held at step one, that Congress had not directly spoken to the precise question at issue. Section 1313(c)(2)(A) does not speak at all to whether the EPA may consider compliance costs when approving a State's proposed water quality standards or, by extension, when approving a State's variance request. At step two, the panel held that the EPA reasonably construed § 1313(c)(2)(A) as permitting it to consider compliance costs when approving water quality standards and variance requests. The panel concluded that the EPA's regulations reasonably interpreted the Clean Water Act as allowing consideration of compliance costs when the agency approves water quality standards and variance requests.

Next, the panel turned to the EPA's appeal, which challenged the district court's partial vacatur of the agency's decision approving Montana's variance request. The district

court held that the variance's term of up to 17 years was invalid because it did not require compliance with the highest attainable condition at the outset of the term, and did not require compliance with Montana's base quality water standards by the end of the term.  The panel disagreed, and held that the EPA's variance regulation unambiguously provided that compliance with the highest attainable condition was not required at the outset.  The district court did not identify any provision in the EPA's variance regulation supporting its view that the variance must require compliance with the base water quality standards by the end of the variance's term.  As reflected in the variance at issue here, the EPA's regulations included numerous features to ensure that dischargers and waterbodies subject to variances continued to improve water quality.  The panel concluded that the regulatory framework was consistent with the goals of the Clean Water Act, which as reasonably construed by the EPA, included supporting aquatic life and recreational uses whenever attainable.

The panel remanded to the district court with instructions to deny Waterkeeper's motion for summary judgment and to grant the EPA's and intervenor-defendants' motion for summary judgment in full.

## COUNSEL

Janette K. Brimmer (argued), Earthjustice, Seattle, Washington, for Plaintiff-Appellee/Cross-Appellant.

John L. Smeltzer (argued), David Gunter, and Alan D. Greenberg, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jonathan D. Brightbill, Principal Deputy Assistant Attorney General; Environment and Natural

Resources Division, United States Department of Justice, Washington, D.C.; David Fatouhi, Peter Z. Ford, Heidi Nalven, and Diane McConkey, Office of General Counsel, United States Environmental Protection Agency; Erin Perkins and Elyana Sutin, Office of Regional Counsel, United States Environmental Protection Agency; for Defendants-Appellants/Cross-Appellees United States Environment Protection Agency and Michael Regan.

Kurt R. Moser (argued), Special Assistant Attorney General, State of Montana Department of Environmental Quality, Helena, Montana, for Intervenor-Defendant-Appellant/Cross-Appellee State of Montana Department of Environmental Quality.

Fredric P. Andes and Ashley E. Parr, Barnes & Thornburg LLP, Chicago, Illinois; Paul M. Drucker, Barnes & Thornburg LLP, Indianapolis, Indiana; Catherine A. Laughner, Chad E. Adams, and M. Christy S. McCann, Browning Kaleczyc Berry & Hoven P.C., Bozeman, Montana; for Intervenor-Defendant-Appellant/Cross-Appellee National Association of Clean Water Agencies and Montana League of Cities and Towns.

Mark L. Stermitz and Jeffery J. Oven, Crowley Fleck PLLP, Billings, Montana, for Intervenor-Defendant-Appellant/Cross-Appellee Treasure State Resources Association of Montana.

# OPINION

WATFORD, Circuit Judge:

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of that objective, the Act requires States to adopt water quality standards regulating pollutants in their navigable waters. Water quality standards consist of two components: (1) the "designated uses" for the water body in question, such as supporting aquatic life or recreational use; and (2) the "water quality criteria" necessary to protect those uses, usually specified as the maximum concentration of a pollutant that may be present in the water. § 1313(c)(2)(A); 40 C.F.R. §§ 131.3(b), 131.11(a). States must submit proposed water quality standards to the Environmental Protection Agency (EPA) for review and approval. 33 U.S.C. § 1313(c). Once approved, water quality standards are used to set effluent limits in the permits that individual dischargers must obtain in order to discharge pollutants from a point source into waters covered by the Act. 40 C.F.R. § 122.44(d)(1); *see* 33 U.S.C. § 1342.

In 2014, the State of Montana adopted water quality standards governing two pollutants, nitrogen and phosphorus, in its "wadeable streams." Montana assigned designated uses for wadeable streams that include the support of aquatic life and recreation, and to protect those uses it specified the maximum permissible concentrations of nitrogen and phosphorus. The EPA approved Montana's water quality standards in 2015.

Under regulations issued by the EPA, States may obtain a variance from approved water quality standards (known as the "base" water quality standards) if compliance with such

standards is shown to be infeasible. *See* 40 C.F.R. § 131.14. A variance is a narrow, time-limited exemption from the base water quality standards, applicable to specific pollutants and to specific dischargers or a particular water body. §§ 131.3(o), 131.14(a). The EPA may approve a variance when the State demonstrates that compliance with the base water quality standards is not feasible for one of several specified reasons. §§ 131.14(b)(2)(i)(A), 131.10(g). One of those reasons, and the reason relevant in this case, is that implementing the pollution controls necessary to attain compliance with the base water quality standards "would result in substantial and widespread economic and social impact." § 131.10(g)(6).

To be approved, a variance must set interim limits that, although less stringent than those imposed by the base water quality standards, nonetheless "represent the highest attainable condition of the water body or waterbody segment applicable throughout the term of the [water quality standards] variance." § 131.14(b)(1)(ii). The term of a variance may last "only . . . as long as necessary to achieve the highest attainable condition." § 131.14(b)(1)(iv).

In 2017, Montana sought EPA approval of the variance at issue in this appeal, which covers 36 municipal wastewater treatment facilities for a term of up to 17 years. The variance allows those facilities to discharge more nitrogen and phosphorus into wadeable streams than would be permitted under the base water quality standards approved in 2015. In support of the proposed variance, Montana submitted evidence demonstrating that these 36 facilities could not attain compliance with the base water quality standards unless they adopted reverse osmosis technology, and that the high cost of adopting such technology would result in substantial and widespread

economic and social impact on the surrounding communities.

After reviewing Montana's evidence and conducting its own analysis, the EPA approved the variance. The EPA agreed with Montana's assessment that (1) implementing reverse osmosis technology would be necessary to attain compliance with the base water quality standards, and (2) the cost of implementing such technology would result in substantial and widespread economic and social impact on the communities served by the 36 municipal wastewater treatment facilities. In reaching that conclusion, the EPA relied on economic guidance that it had previously issued, which provides that an average annual cost per household exceeding 2% of median household income in the affected community constitutes a substantial economic impact. The EPA's analysis confirmed that costs of that magnitude would indeed be imposed on each of the affected communities. The EPA also determined that the interim limits imposed by the variance represented the highest attainable condition for all 36 facilities, and that the variance's term of up to 17 years would last only "as long as necessary to achieve the highest attainable condition." 40 C.F.R. § 131.14(b)(1)(iv), (2)(ii).

In this action, plaintiff Upper Missouri Waterkeeper (Waterkeeper) does not challenge any of the EPA's factual determinations. It instead contends that the EPA's approval of Montana's variance request violates the Administrative Procedure Act because it is "not in accordance with law." 5 U.S.C. § 706(2)(A). Specifically, Waterkeeper argues that the Clean Water Act prohibits the EPA from considering compliance costs when granting variance requests.

On cross-motions for summary judgment, the district court rejected Waterkeeper's argument. The court concluded that the EPA has reasonably construed the Clean

Water Act as permitting it to grant variances based on the economic impact that would be caused by requiring compliance with the base water quality standards. The court nevertheless held that the EPA's approval of the variance's term of up to 17 years was arbitrary and capricious because it does not require compliance with the highest attainable condition at the beginning of the variance term and does not require compliance with Montana's base water quality standards by the end of the term. The court granted partial vacatur of the EPA's approval of the variance and stayed its decision pending resolution of these appeals.

On appeal, Waterkeeper urges us to reverse the district court's rejection of its Administrative Procedure Act challenge to the EPA's approval decision, while the EPA and the intervenor-defendants (the Montana Department of Environmental Quality, Treasure State Resources Association of Montana, Montana League of Cities and Towns, and National Association of Clean Water Agencies) urge us to reverse the district court's partial vacatur of that decision. We affirm in part, reverse in part, and remand with instructions to enter judgment in favor of the EPA and the intervenor-defendants.

I

We take up Waterkeeper's cross-appeal first. It contends that the following provision of the Clean Water Act precludes the EPA from taking compliance costs into account when approving variance requests:

> Whenever the State revises or adopts a new standard, such revised or new standard shall be submitted to the Administrator. Such revised or new water quality standard shall consist of the designated uses of the

> navigable waters involved and the water quality criteria for such waters based upon such uses.  Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter.  Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.

33 U.S.C. § 1313(c)(2)(A).  This provision addresses the establishment of water quality standards, not the granting of variances, and thus appears at first blush to be of limited relevance to Waterkeeper's argument.  Water quality standards and variances, however, are closely linked in the regulatory framework created by the EPA after the Clean Water Act's passage.  A bit more background on that framework is necessary before proceeding.

The EPA has interpreted § 1313(c)(2)(A) as authorizing States to consider compliance costs when they first adopt water quality standards.  In enforcing that provision's directive that water quality standards "serve the purposes of this chapter," the EPA has looked to the opening provision of the Clean Water Act, § 101, codified at 33 U.S.C. § 1251, to identify those purposes.  Section 1251(a)(2) of the Act declares that "it is the national goal that *wherever attainable*, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983."  33 U.S.C. § 1251(a)(2) (emphasis added).

Although the deadline set by this provision has passed, the EPA has reasonably construed § 1251(a)(2) as an ongoing expression of Congress's intent that the stated goal be achieved (albeit much later than hoped for) whenever the specified uses are "attainable." *See* 40 C.F.R. § 131.2.

The EPA's regulations require States to adopt water quality standards that protect the uses described in § 1251(a)(2) unless the State can show through a "use attainability analysis" that attaining the water quality necessary to support those uses is not feasible for any one of the several reasons referenced earlier. *See* 40 C.F.R. § 131.10(g), (j); Water Quality Standards Regulatory Clarifications, 78 Fed. Reg. 54,518, 54,522–23 (Sept. 4, 2013). Thus, a State may adopt a water quality standard that does not designate the uses described in § 1251(a)(2) if it can show that implementing the pollution controls necessary to protect those uses "would result in substantial and widespread economic and social impact." 40 C.F.R. § 131.10(g)(6). Economic impact, of course, involves consideration of the costs that would be imposed on the affected stakeholders.[1]

The EPA adopted its variance regulation by building on this same framework. The agency recognized that States could decline to designate a use in the first instance (or

---

[1] The EPA's regulations make clear that compliance costs may be considered only when designating the *uses* to be protected by water quality standards. Once those uses have been designated, States must adopt water quality *criteria* adequate to protect those uses, "based on sound scientific rationale." 40 C.F.R. § 131.11(a)(1); *see Mississippi Commission on Natural Resources v. Costle*, 625 F.2d 1269, 1277 (5th Cir. 1980). A variance does not modify the water quality criteria alone. A variance is instead a time-limited modification of both the "designated use and criterion." 40 C.F.R. § 131.3(o).

remove a previously designated use) by conducting a use attainability analysis and making the required showing that attainment of such a use is not feasible.  If approved, that action would remove the designated use and associated water quality criteria from the water quality standard as applied to all dischargers and all pollutants.

In light of this reality, the EPA concluded that variances "are an environmentally preferable tool over a designated use change because variances retain designated use protection for all pollutants as they apply to all sources with the exception of those specified in the variance."  78 Fed. Reg. at 54,531.  The variance procedure thus affords States a more targeted option when compliance with a water quality standard is unattainable only for certain dischargers or only with respect to certain pollutants.  The variance regulation requires States to make the same showing required by a use attainability analysis, just one that is limited in scope to the specific dischargers and pollutants covered by the variance.

Waterkeeper recognizes this link between water quality standards and variances.  Its contention under the Administrative Procedure Act is that the provision quoted at the outset, 33 U.S.C. § 1313(c)(2)(A), precludes the EPA from taking compliance costs into account when approving *either* water quality standards *or* variances.  In assessing this contention, we employ the two-step framework established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

At step one, we ask whether "Congress has directly spoken to the precise question at issue."  *Id.* at 842.  The answer here is no.  Section 1313(c)(2)(A) does not speak at all to whether the EPA may consider compliance costs when approving a State's proposed water quality standards or, by extension, when approving a State's variance request.  The

provision is silent on the precise question at issue, but if anything, its reference to protecting the "public health *or welfare*" favors the EPA's interpretation.     33 U.S.C. § 1313(c)(2)(A) (emphasis added).     The concept of the public welfare is broad enough to encompass a regulatory program's impact on the economic welfare of a community, and an assessment of that impact requires consideration of costs.

It is true, as Waterkeeper argues, that § 1313(c)(2)(A) includes a list of uses and values that States must "tak[e] into consideration" when establishing water quality standards, without expressly mentioning the costs of compliance.     But the inference that Waterkeeper asks us to draw—that Congress's silence as to costs reflects an intention to forbid their consideration—is not supported by the text of the provision or the broader statutory context.     Requiring States to formulate water quality standards by "taking into consideration" various uses and values does not tell us anything about whether Congress intended to mandate compliance with water quality standards regardless of how exorbitant the cost might prove to be.     And nothing in the other provisions of the Clean Water Act suggests that Congress's silence as to costs in § 1313(c)(2)(A) should be accorded special weight, as was true of the statutory provision at issue in *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457 (2001), the principal case on which Waterkeeper relies.

In *American Trucking*, certain provisions of the Clean Air Act "explicitly permitted or required economic costs to be taken into account in implementing the air quality standards," whereas the provision under review in that case did not, leading to the conclusion that Congress's silence was intended to foreclose consideration of costs. *Id.* at 467.

The same cannot be said of the portion of the Clean Water Act we are reviewing, which precludes us from drawing the inference Waterkeeper urges about the supposed import of Congress's silence as to costs in § 1313(c)(2)(A).  Rather, as in *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009), we think Congress's silence as to costs in § 1313(c)(2)(A) can be understood "to convey nothing more than a refusal to tie the agency's hands as to whether cost-benefit analysis should be used, and if so to what degree."  *Id.* at 222 (interpreting § 316(b) of the Clean Water Act, codified at 33 U.S.C. § 1326(b)).

Having concluded that the statute is silent or ambiguous as to the precise question raised, we ask at step two of the *Chevron* analysis whether "the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  For two reasons, both alluded to above, we think the EPA has reasonably construed § 1313(c)(2)(A) as permitting it to consider compliance costs when approving water quality standards and variance requests.

First, the provision states that water quality standards shall protect the "public . . . welfare," and that term can reasonably be understood to encompass consideration of whether compliance costs would cause substantial and widespread economic and social impact.  And second, the EPA has reasonably construed § 1313(c)(2)(A)'s requirement that water quality standards "serve the purposes of this chapter" as incorporating the purposes referred to in 33 U.S.C. § 1251(a)(2).  Congress declared in § 1251(a)(2) that water quality necessary to protect aquatic life and recreational use is to be achieved "wherever attainable."  The statute does not define what factors may be taken into account when deciding whether a particular use is "attainable," so it fell to the EPA to flesh out the meaning of

that term.  The agency could perhaps have interpreted the term to focus solely on whether achieving water quality of a particular level is *technologically* feasible, even if the costs involved would prove financially ruinous to the communities benefitting from the improvements.  But it seems far more plausible that Congress used the term in the sense reflected in the EPA's regulations—as including an assessment of whether achieving the necessary water quality is *economically* feasible, given the costs that would be imposed on the affected communities.

We thus conclude that the EPA's regulations reasonably interpret the Clean Water Act as allowing consideration of compliance costs when the agency approves water quality standards and variance requests.

II

We turn now to the EPA's appeal, which challenges the district court's partial vacatur of the agency's decision approving Montana's variance request.  The court held that the variance's term of up to 17 years is invalid because it (1) does not require compliance with the highest attainable condition at the outset of the term, and (2) does not require compliance with Montana's base water quality standards by the end of the term.  The district court believed these requirements were imposed by the EPA's own variance regulation, but the plain language of the regulation unambiguously provides otherwise.  We therefore have no need to decide whether the EPA's interpretation of its regulation is entitled to deference under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

A

In ruling that compliance with the highest attainable condition must be achieved at the outset of a variance's term, the district court relied on the EPA's definition of a variance. The regulation defines the term "water quality standards variance" as a "time-limited designated use and criterion for a specific pollutant(s) or water quality parameter(s) that reflect the highest attainable condition *during the term* of the [water quality standards] variance." 40 C.F.R. § 131.3(o) (emphasis added). The court concluded that the phrase "during the term" requires compliance with the highest attainable condition at the *beginning* of the variance's term. On appeal, in defending the district court's ruling, Waterkeeper points to another provision of the regulation, which states that the interim limits imposed by the variance must represent "the highest attainable condition of the water body or waterbody segment applicable *throughout the term* of the [water quality standards] variance." § 131.14(b)(1)(ii) (emphasis added). Waterkeeper contends that the phrase "throughout the term" has the same meaning as the phrase "during the term" in § 131.3(o), and that both require compliance with the highest attainable condition at the very outset of the term.

We do not think either phrase can fairly be read in the manner that the district court and Waterkeeper suggest. To be sure, both of the cited provisions provide that the highest attainable condition specified in the variance shall *apply* throughout (or during) the variance's term, from the beginning of the term to the end. But those provisions do not state that an individual discharger must be in compliance with the highest attainable condition on day one.

Instead, the EPA's variance regulation unambiguously provides that compliance with the highest attainable

condition is *not* required at the outset.  A variance request may be approved only when a State can show that compliance with the base water quality standards cannot feasibly be attained.  § 131.14(b)(2)(i)(A).  If approved, the variance replaces the base water quality standard with the most rigorous standard that can feasibly be attained—the "highest attainable condition."    § 131.14(b)(1)(ii).    The regulation then provides that a variance may remain in effect only "as long as necessary to *achieve* the highest attainable condition."    § 131.14(b)(1)(iv)  (emphasis added).    That provision makes clear that the purpose of a variance is to provide the time needed to achieve this attainable interim standard, which means, of course, that compliance with the highest attainable condition is required by the *end* of the variance's term, not at the beginning.

B

The district court did not identify any provision in the EPA's variance regulation supporting its view that a variance must require compliance with the base water quality standards by the end of the variance's term.  We have found nothing in the regulation to support that view either.  As just noted, the regulation explicitly states that the term of the variance may last only as long as necessary to achieve compliance with the *highest attainable condition*—not with the  base  water  quality  standards.    40  C.F.R. § 131.14(b)(1)(iv).  As this provision reflects, the purpose of a  variance  is  to  make  incremental  progress  toward compliance with the base water quality standards, but the ultimate goal by the end of the variance's term is to achieve compliance with the highest attainable condition.  Indeed, if compliance with the base water quality standards *were* feasible within a reasonably foreseeable timeframe—say, by the end of the variance's term—there would be no basis for

granting a variance in the first place. When attainment of the base water quality standards is feasible within a reasonably foreseeable timeframe, a State may instead use a permit compliance schedule to set a specific deadline by which compliance with the base water quality standards will be achieved. § 122.47; *see* Water Quality Standards Regulatory Revisions, 80 Fed. Reg. 51,020, 51,039–40 (Aug. 21, 2015).

In defense of the district court's ruling, Waterkeeper contends that unless a variance requires compliance with the base water quality standards by the end of the term, States would be free to postpone compliance with the base standards indefinitely simply by securing one variance after another, in conflict with the goals of the Clean Water Act. That contention reflects a misunderstanding of the nature and purpose of a variance. A variance may be granted only when compliance with the base water quality standards is not feasible for one of the reasons specified in the EPA's regulations. To be approved, the variance must require compliance with the highest attainable condition that *is* feasible, and the variance may last only as long as necessary to achieve compliance with the highest attainable condition. If at the end of the variance's term compliance with the base water quality standards has become feasible, another variance may not be granted. And, to obtain another variance, the State must submit an application subject to the same degree of EPA scrutiny and public participation as was the application for the initial variance. In the interim, while compliance with the base water quality standards remains unattainable, the variance's requirements ensure that incremental progress toward attainment of the base standards is being made.

The variance at issue here reflects these safeguards. In accordance with the regulation, the variance states: "Through the permitting process and the specific details of each facility, the time required must be as short as possible to meet the highest attainable condition." This period may be "up to 17 years," but the period permitted for an individual facility carefully tracks the steps the facility must take to achieve compliance with the highest attainable condition. If a facility reaches the highest attainable condition but still cannot attain compliance with the base water quality standards, the facility must implement a "pollutant minimization program"—that is, "a structured set of activities to improve processes and pollutant controls"— as detailed in the variance. The variance is also subject to close review every three years. Thus, as reflected in the variance at issue here, the EPA's regulations include numerous features to ensure that dischargers and waterbodies subject to variances continue to improve water quality.

The regulatory framework discussed above is fully consistent with the goals of the Clean Water Act, which, as reasonably construed by the EPA, include supporting aquatic life and recreational uses "wherever attainable." 33 U.S.C. § 1251(a)(2).

\* \* \*

We reverse the portion of the district court's summary judgment order challenged in Nos. 19-35898, 19-35899, 20-35135, and 20-35136, and affirm the portion of the summary judgment order challenged in No. 20-35137. We remand to the district court with instructions to deny Waterkeeper's motion for summary judgment and to grant the EPA's and

intervenor-defendants' motions for summary judgment in full.

**AFFIRMED in part, REVERSED in part, and REMANDED with instructions.**

The parties shall bear their own costs on appeal.